**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

UNITED STATES OF AMERICA,                        Case No. 1:21-CR-785

          **Plaintiff,**

          -vs-
                                  **JUDGE PAMELA A. BARKER**

RICHARD BURNLEY,

          **Defendant.**                        **MEMORANDUM OPINION & ORDER**

This matter is before the Court upon Defendant Richard Burnley's ("Defendant") Motion to Suppress (Evidentiary Hearing Requested) filed on January 3, 2023 ("Defendant's Motion"). (Doc. No. 19.)  On January 10, 2023, the United States of America filed a Response In Opposition To Defendant's Motion ("the Government's Response").  (Doc. No. 20.)  On January 17, 2023, Defendant filed a Brief In Reply ("Defendant's Reply").  (Doc. No. 22.)  In Defendant's Motion, Defendant asserts that:  1.) Defendant's statements to law enforcement should be suppressed because he did not knowingly, voluntarily and intelligently waive his *Miranda* rights; and 2.) Defendant's Fourth Amendment right against unreasonable searches was violated when police conducted a warrantless search of his vehicle.  (Doc. No. 19, PageID #s 53-56.)

By a non-document Order issued on January 13, 2023, and pursuant to an agreed-upon date by counsel for the parties, the Court set the hearing on Defendant's Motion for March 13, 2023.  On January 30, 2023, Defendant filed a Notice of Expert Testimony Under Federal Rule of Evidence 702, notifying the Court and counsel for the Government of his intent to offer expert testimony from Thomas Sullivan, PH.D., ABPP, a Board-Certified Clinical Neuropsychologist ("Defendant's Notice").  (Doc. No. 23.)  Attached to Defendant's Notice were Dr. Sullivan's CV that includes a list

of his publications, and a list of cases in which Dr. Sullivan has testified as an expert within the last four years.  (Doc. Nos. 23-1 and 23-2.)  On March 7, 2023, Defendant filed a letter authored by Dr. Sullivan wherein Dr. Sullivan stated that he had "observed [Defendant's] behavior on [police body cam videos] and will offer testimony that [Defendant] suffered a mild traumatic brain injury or concussion as a result of the motor vehicle accident."  (Doc. No. 27, PageID # 106.)

On February 27, 2023, the Government filed a Motion for Daubert Hearing and Objection to Defense Expert ("the Government's Motion"), which Defendant opposed, but the Court granted on March 3, 2023.  (Doc. Nos. 25, 26, and non-doc. order dated 3/3/2023.)  The Daubert Hearing was conducted on March 13, 2023.

**Background[1]**

On August 6, 2021, Defendant Burnley was an occupant of a vehicle involved in a motor vehicle accident with a City of Cleveland Police cruiser, occupied by two officers, at East 75th, south of Union Avenue, in Cleveland, Ohio.  As the officers approached Defendant who was standing outside the passenger side of car he had occupied, they demanded that Defendant get on the ground and show them his hands. Defendant complied and he was handcuffed. Defendant stated, "I'm the passenger man," and the driver had run off.  In response to an officer telling Defendant how serious the accident was, Defendant stated that he "completely understand[s]", his cousin was driving, and he ran.  The police are given a description of the driver as wearing a black Nike hoodie and blue jeans.  In this body camera footage, the deployment of both airbags in each of the two vehicles involved can be seen.

---

[1] This background information or facts are evidenced by the body cam videos identified at the hearing as Government's Exhibits 2 and 4, and Defendant's Exhibits G1, G2 and G3, as reviewed by the Court.  Portions of these videos were played during the hearing, as identified in the draft Transcript of the hearing.

Shortly after this exchange, another officer asked Defendant who was driving the car and Defendant responded that he could not tell him the driver's name, but it would not matter anyway because they would not find him. Defendant stated that he assumed the driver owned the car because he had seen him in it, that the driver lived off St. Clair, and that he was getting a ride to visit his friend.

After this discussion, two firearms were found in the vehicle that Defendant had been occupying. Then, Defendant was asked if the driver had anything else in the car, at which time Defendant stated, "I don't even know what the f*** really just happened." Defendant then continued to state that he did not know he had been in an accident, that it involved a police officer or that the car had been damaged. Officers then engaged in an exchange among themselves concerning Defendant, stating: "do you think he has a concussion or is just playing dumb"; "it might be both, man, honestly"; and then "he was fine until I was asking a little more questions." Subsequently, an officer read Defendant his *Miranda* rights, and another officer can be heard asking Defendant whether he is impaired, and whether he knows where he is and what day it is. Defendant was questioned about the two guns located in the vehicle, and Defendant denied any knowledge of them.

An emergency medical services ("EMT") individual arrived on scene and asked Defendant where he was hurting, to which Defendant responded that his right knee was hurting. When asked by the EMT if he was driving the car, Defendant responded, "I think so, it's my car." The EMT reported to officers that Defendant was stable.

Later, as evidenced by Government's Exhibit 4-A, Defendant stated that before the crash, he had received a call about his grandma and was on his way to see her, he had passed a car over the hill, the accident was his fault, "completely [his] fault," and the car was his.

3

**Dr. Sullivan's Testimony**

Dr. Sullivan was the sole witness that testified at the Daubert Hearing.  Dr. Sullivan testified that he is a psychologist who has been licensed in Ohio for many years.  After obtaining a degree from Merrimack College in psychology, he earned his master's degree in clinical psychology at the University of Cincinnati.  Dr. Sullivan completed his doctoral degree, then he completed a two-year post-doctoral fellowship in clinical neuropsychology at Cincinnati Children's Hospital Medical Center, and he completed his board certification in clinical neuropsychology. Dr. Sullivan has been on the staff at Cincinnati Children's Hospital since 1993.  From 1998 until 2010, he was the sole neuropsychological provider for the Cincinnati Bengals.  Dr. Sullivan worked directly with the National Football League from 2010 to 2012, and then returned to the Cincinnati Bengals in 2012. Since then, Dr. Sullivan, along with others, has provided concussion management for the Bengals.

Dr. Sullivan testified that he has testified several hundred times in local, state, and federal courts in the United States, in both civil and criminal cases.  He estimated that probably eighty percent (80%) of his testimony has been provided in civil cases, and in the criminal cases where he has provided testimony, he has been retained as an expert by both the prosecutor and the defense. Currently, Dr. Sullivan is an adjunct professor at Xavier University, teaching clinical neuropsychology to the University's doctoral students.  He has made presentations as an expert and has testified before the Ohio Legislature on two occasions concerning issues relating to concussion or traumatic brain injury.

Defendant's counsel confirmed with Dr. Sullivan that the foregoing testimony was included in his resume, marked as Defendant's Exhibit A.

Dr. Sullivan was asked, "using best practices" how he would make the determination that an individual has suffered a concussion.  He responded as follows:

> Historically what we have done is we have personally interacted with the person, so a person has a slip and fall and then somebody interacts with them and typically completes what's called the Glasgow Coma Scale.  **Since the invention of police body cams and smart phones, this is frequently done via video.  And so many times the individuals are evaluated via videotape or a video link using the Glasgow Coma Scale.[2]**

(Draft Transcript, page 9, lines 1-8.)  (Emphasis added.)

Defendant's counsel introduced as Exhibit B, a copy of the Glasgow Coma Scale, and inquired of Dr. Sullivan the requirements thereof and what it evaluates.  Dr. Sullivan testified that the Glasgow Coma Scale is a "standardized method of evaluating somebody's level of consciousness" and "evaluates three different parameters, the person's eye opening, their motor response, and their verbal response."[3]  Dr. Sullivan confirmed that this test can assess impaired consciousness or "**help** to determine whether an individual has suffered from a concussion."[4]  Dr. Sullivan testified that there are a number of different assessment tools that a doctor can use to assess whether there is a concussion, and the severity of that concussion.

Dr. Sullivan testified that the Sports Concussion Assessment Tool ("SCAT5") is another tool that can be used and is one that he has used to assess a concussion and the severity thereof.  According to Dr. Sullivan, the SCAT5 looks for alterations in consciousness, and it employs not only the Glasgow Coma Scale, but for example, also the balance error scale.  Specifically, as a

---

[2] As set forth *infra*, in his subsequent testimony, Dr. Sullivan did not testify concerning how "frequently" completion of the Glasgow coma scale is "done via video", and he did not provide any examples, including his own or those of other medical professionals, of the "many times" an individual has been evaluated via videotape or a video link to determine if that individual has suffered a concussion using the Glasgow Coma Scale.
[3] Draft Transcript, page 9, lines 13-16.
[4] *Id.*, p. 9, lines 24-25, p. 10, lines 1-2. (Emphasis added.)

5

Neuropsychologist for the Bengals, he employs the SCAT5; a football player's balance is checked; his Glasgow Score is checked; and "a number of different things are checked."[5]  Dr. Sullivan identified Defendant's Exhibit C as the SCAT5 tool.[6]

Dr. Sullivan testified that he evaluated Defendant for concussion by watching the police body camera videos to determine if Defendant had showed symptoms of an alteration in consciousness. He did not review any medical records of Defendant, maintaining that it was not necessary to do so. Dr. Sullivan testified that just watching the body cam videos after the accident was sufficient to allow him to opine regarding whether Defendant had sustained a concussion.  His focus was on Defendant's level of functioning when he was provided his *Miranda* rights and whether he could intelligently waive those rights.  According to Dr. Sullivan, Defendant's level of functioning at the hospital an hour later was of no consequence in evaluating whether Defendant had sustained a concussion.[7]

Based upon his review of the body cam videos, Dr. Sullivan opined or determined that Defendant showed an alteration of consciousness before his *Miranda* rights were read to him.  His opinion was based upon what he saw in the videos, specifically:  although Defendant was conversing, he was confused and disoriented; he knew past information like phone numbers and a name of an attorney he wanted to contact, but he was unable to lay down new memories; he was confused and

---

[5] *Id.*, p. 11, lines 5-7.

[6] The SCAT5 provides in relevant part:  "The diagnosis of a concussion is a clinical judgment, made by a medical professional.  The SCAT5 should NOT be used by itself to make, or exclude, the diagnosis of concussion.  An athlete may have a concussion even if their SCAT5 is 'normal'."  It also identifies five elements or steps that are critical in an immediate assessment:  STEP 1: RED FLAGS; STEP 2: OBSERVABLE SIGNS; STEP 3: MEMORY ASSESSMENT MADDOCKS QUESTIONS; STEP 4: EXAMINATION GLASGOW COMA SCALE (GCS); and CERVICAL SPINE ASSESSMENT.

[7] Dr. Sullivan went on to explain that the only way that having any medical records from St. Vincent Charity Hospital, where Defendant was transported from the scene, would have aided him in his determination of whether Defendant had sustained a concussion, is if, while there, he showed a Glasgow Score of 14, consistent with his determination of the Glasgow Score based upon his review of the body cam videos.  But Dr. Sullivan explained that it is possible that Defendant's Glasgow Score would have normalized to 15 by the time he was examined at the hospital.

kept asking the officers what happened; those interacting with Defendant kept asking him if he was impaired in some way, whether he was stoned from drugs or drunk, if he was able to recite the alphabet, and mentioned that Defendant showed signs of concussion, with one officer, 16 seconds before he was *Mirandized*, questioning whether Defendant had experienced a concussion; and after Defendant was *Mirandized* he continued to question what happened, with a blank look on his face, and wearing only one shoe, and continued to act confused and disoriented.

Ultimately, Dr. Sullivan expressed his opinion that Defendant did experience a concussion because of the car accident and that he showed a Glasgow Coma Scale score 14 in the video clips that were played during the hearing.  According to Dr. Sullivan, Defendant showed appropriate eye opening, appropriate motor response, and he was conversant but confused and disoriented, meaning Defendant earned a score of four on his verbal response, resulting in a Glasgow Coma Scale score of 14, which is indicative of a mild traumatic brain injury.

When asked to explain how Defendant could apparently answer some of the questions but not others and still be diagnosed with a concussion, Dr. Sullivan responded that "part of the evidence that [he] used that [Defendant] was not faking or playing dumb is he didn't show **any** what's called retrograde amnesia" and "[p]eople who experienced concussions **rarely show any type** of retrograde amnesia."[8]  Dr. Sullivan opined that Defendant showed anterograde amnesia,[9] i.e., he was having

---

[8] Draft Transcript, p. 19, lines 7-11.  (Emphasis added.)  According to Dr. Sullivan, those individuals with concussions sometimes show a very short period of retrograde amnesia which entails not remembering earlier events or those that occurred immediately before the injury or perhaps even the day that the injury occurred.  While upon direct examination Dr. Sullivan testified that Defendant did not show "any" type of retrograde amnesia, upon cross-examination he testified that Defendant exhibited a "mild" or "insignificant" amount of retrograde amnesia.

[9] Dr. Sullivan explained that people who have experienced a concussion commonly show disorientation and show anterograde amnesia meaning they cannot remember new stuff, but they can remember things that happened previously.

difficulty laying down new memories which Dr. Sullivan testified is "perfectly consistent with the neurochemistry of concussions".

When asked how a diagnosis of concussion such as the one that Dr. Sullivan had made might be peer-reviewed, Dr. Sullivan testified concerning the Glasgow Coma Scale, specifically that: it was created in 1974; there has been a tremendous amount of research done about it; it is used millions of times every day; research demonstrates that it is remarkably reliable and consistent; and it adequately provides information about the person's level of functioning and the implications of that level of functioning.

Dr. Sullivan testified that in reviewing the body cam videos and making his determination and preparing his opinion to provide at the hearing, he relied upon research in the area of concussion, specifically:  Defendant's Exhibit D, which is a "Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004; Defendant's Exhibit E, which is a "Consensus statement on concussion in sport—the 5th international conference on concussion in sport held in Berlin, October 2016"; and Defendant's Exhibit F, which is a "Consensus Statement on Concussion in Sport – the 3rd International Conference on Concussion in Sport held in Zurich, November 2008".  These documents make it clear that they were developed for use by physicians, therapists, certified athletic trainers, health professionals, coaches and other people involved in the care of injured athletes, and to understand sports related concussion.

Each of these documents sets forth signs and symptoms of a concussion that include:  somatic symptoms such as a headache or pressure in the head; cognitive symptoms such as feeling like in a fog or confusion or fatigue and a feeling of slowness; emotional symptoms such as lability; physical signs such as loss of consciousness, amnesia, neurological deficit; balance impairment such as gait

unsteadiness or dizziness or poor coordination ; behavioral changes such as irritability; cognitive impairment such as slowed reaction times; and sleep/wake disturbance such as somnolence and drowsiness; or vomiting and slurred speech.

None of these documents specifically reference the Glasgow Coma Scale.  However, Dr. Sullivan testified that to the extent any of these documents refer to the "SCAT", the Glasgow Coma Scale is included as an assessment tool in the "SCAT".  Dr. Sullivan did testify that the Glasgow Coma Scale is less comprehensive than the SCAT.  He further testified that another assessment tool for concussions is the Standardized Assessment of Concussion ("SAC"), which tests an athlete's orientation, immediate memory, concentration, delayed memory and takes about five minutes to complete.  And, according to Dr Sullivan, it, too, references the Glasgow Coma Scale.  Dr. Sullivan agreed that these tests include things like stating the date and the month of the year, and memorizing a list of words and therefore, entail or necessitate interacting with and observing a person and asking him or her questions.

Dr. Sullivan also agreed that the SCAT5 includes tests, to include physical tests like a neck evaluation, a balance assessment, and a yes or no symptom checklist; and whether it is the SAC or SCAT5 which is administered, these tests are performed or conducted by experts who know what to ask, and what to detect while they are interacting with the person.  He also stated that one thing he did not like about the videos is that Defendant was resting on the back quarter panel of his car, and therefore he could not do an assessment of his balance.  Also, Dr. Sullivan testified that other functions that are commonly tested are ocular motor functioning and reflexes and there were no such assessments or tests demonstrated in the body cam videos.  Dr. Sullivan would have evaluated these if he had been on the scene.

The Government showed a selected portion of Government's Exhibit 2-A to Dr. Sullivan who agreed that it demonstrated Defendant responding to a police officer's question as to whether he saw the driver, with the statement "I'm a passenger, man." Dr. Sullivan agreed that this portion of the video, when compared to portions of the video taken subsequently where Defendant repeatedly asked what just happened or what is going on, demonstrated a difference in Defendant's ability to understand what was going on around him in those two interactions. When asked if this raised a question of whether Defendant was faking his confusion or amnesia, Dr. Sullivan initially responded as follows: "Yeah. That – that's the part of the analysis that left me scratching my head for a bit. I was looking at the video and wondering if Mr. Burnley was lying."[10] Dr. Sullivan went on to explain that in the later-in-time portion of the video, Defendant was either confused or he was purposefully not telling the truth, he could not tell; but after looking at this part of the video and wondering if Defendant was lying, Dr. Sullivan testified that he ultimately concluded or realized that people who have concussions very frequently lie while they have concussions. Based upon his review of that portion of the video where Defendant reported that the driver had run off and he was the passenger, Dr. Sullivan could not tell whether Defendant was just grossly confused or whether he was actively telling the officers something that was not true. However, he then stated that after reviewing the rest of the videos, he was confident that Defendant was confused and not lying.

Dr. Sullivan pointed to a portion of the videos demonstrating Defendant asking a young lady to make a phone call for him to his attorney, whose name and phone number Defendant was able to recite, as convincing him that Defendant was not malingering. According to Dr. Sullivan, this

---

[10] Draft Transcript, p. 39, lines 1-3.

demonstrated anterograde amnesia which is consistent with a concussion, as distinguished from strong or significant periods of retrograde amnesia, which is not.  Also, according to Dr. Sullivan, the fact that Defendant was able to say and spell his name and provide his date of birth is consistent with anterograde amnesia and "mild" or "insignificant" retrograde amnesia  Dr. Sullivan did acknowledge that there are a number of methods for assessing malingering, to include watching the person's behavior, and that there are limitations in evaluating someone based solely on a video, but he offered that there are things about the video that are particularly compelling, as well.

Dr. Sullivan was shown another portion of the video marked as the Government's Exhibit 4-A, showing Defendant's statements about 25 to 30 minutes after his statements demonstrating confusion regarding what had happened.  Dr. Sullivan acknowledged that in this portion of the video, Defendant is heard stating that he was the driver, the accident was his fault, he was in a hurry to see his grandma, he drove around another car, and it was a stupid thing to do.  According to Dr. Sullivan, though, that's a very common occurrence.  He explained that there are different grades of concussion, including a grade one concussion where a person experiences confusion of less than 30 minutes, and a grade two concussion where a person is not knocked unconscious but experiences more than 15 minutes of confusion.

When the Court inquired of Dr. Sullivan regarding how many times he had testified in state or federal court that an individual had sustained a concussion based solely on his review of body cam videos, Dr. Sullivan testified that he did not remember a previous federal case with similar circumstances.  Then Dr. Sullivan stated that he did not know the exact number of times he had opined as to whether someone had sustained a concussion based solely on video evidence.  And, upon re-direct, Dr. Sullivan testified that he could not provide a citation to any case where he had testified

11

as an expert and opined that somebody had sustained a concussion based only upon his review of body cam video, or even a general set of facts associated with one of the "handful" of cases Dr. Sullivan referenced in his testimony.  Dr. Sullivan's testimony concerning how many times and where he had testified in court concerning his opinion, based solely on review of body cam videos, that someone had sustained a concussion so as not to be able to waive, voluntarily, knowingly, and intelligently, his or her *Miranda* rights left this Court questioning or less than convinced that Dr. Sullivan had ever done so in any federal or state court.[11]

Finally, it is important to note what Dr. Sullivan did not testify to during the hearing.  First, at no point in time did Dr. Sullivan express his opinion(s), specifically that Defendant sustained a concussion because of the accident, and that therefore, he could not have voluntarily, intelligently, and knowingly waived his *Miranda* rights, to a reasonable degree of medical or psychological certainty or probability.  Second, Dr. Sullivan never testified that a board-certified clinical neuropsychologist's or any other medical professional's evaluation and determination or opinion of whether a person had sustained a concussion by assigning a Glasgow Coma score solely upon reviewing body cam videos has been peer reviewed.  Third, Dr. Sullivan did not provide competent or credible testimony concerning any instance where he has been permitted to express, in federal or state court, that an individual sustained a concussion by assigning a Glasgow Coma score based solely upon review of body cam videos.  Finally, Dr. Sullivan did not provide sufficient factual bases for his assertions that "[s]ince the invention of police body cams and smart phones, [evaluating an

---

[11] The exchange between the Court and Dr. Sullivan is contained at pages 52 through 56 of the Draft Transcript.  The Government's re-direct is captured at page 71 of the Transcript.  Indeed, after the testimony of Dr. Sullivan had concluded, the Court stated that it "never got a straight answer" from Dr. Sullivan regarding this issue, and defense counsel stated, "I would agree with your characterization…."  (Draft Transcript, p. 81, lines 1-11.)

individual via videotape or a video link using the Glasgow coma scale] is frequently done via video," and that "many times" individuals are evaluated for concussion via videotape or a video link using the Glasgow coma scale.

### Law and Analysis

Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R Evid. 702.

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny require that the trial court act as a "gatekeeper" with respect to expert testimony under Federal Rule of Evidence 702.  According to *Daubert*, the trial court must determine whether the proffered expert testimony is both reliable and relevant.  In *Daubert*, the court explained that when faced with a proffer of expert scientific, testimony, the trial judge must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue" and that this determination "entails a preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.  It went on to state that "[m]any factors will bear on [this] inquiry," and there is no "definitive checklist or test."  Rather, the test for admissibility of expert testimony is a "flexible" one focused on "principles and methodology" of the expert.  *Id.* At 594-95.

In *Daubert*, the court set forth a non-exhaustive list of factors for trial courts to use in assessing the reliability of scientific expert testimony, to wit:  (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-94; *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed.Appx. 479, 483 (6th Cir. Sept.3, 2022).  The trial court's overall task is to ensure that a testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2 238 (1999).

In *Daubert*, the court also explained:

> "Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules.  Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

*Daubert*, 509 U.S. at 595.

The Sixth Circuit has developed further guidance by outlining several "[r]ed flags that caution against certifying an expert."  *Newell Rubbermaid, Inc v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir.2012), citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 177 (6th Cir.2009).  These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Id.*  In addition, if an expert's testimony was prepared solely for litigation, this may also be grounds for exclusion.  *Id.*

14

Finally, the proponent of an expert bears the burden of demonstrating that the expert's testimony satisfies *Daubert*. *Nelson v. Tennessee Gas Pipeline Company*, 243 F.3d 244 251 (6th Cir.2001).

In the Government's Motion, the Government argues that Dr. Sullivan's expert testimony is based on insufficient facts or data, in violation of the second prong of Federal Rule of Evidence 702. According to the Government, Dr. Sullivan's reliance on body cam videos only, i.e., anecdotal evidence, and the absence of any direct, physical examination of, or interaction with Defendant by Dr. Sullivan, and his failure to review any of Defendant's medical records post-accident, i.e., lack of actual data, "is precisely the type of 'red flag' which cautions against certifying [Dr. Sullivan]." (Doc. No. 25, PageID # 99.)  The Government also points out that Dr. Sullivan's opinion fails to consider that Defendant's statements about not knowing what had just happened or evidence of anterograde amnesia, his blank stare, and his apparent obliviousness to missing a shoe could have been caused, not by a concussion, but by malingering or "faking" to avoid criminal penalties for the two firearms recovered from the vehicle.  The Government also asserts that Dr. Sullivan's testimony was prepared solely for litigation.  The Government argues that Dr. Sullivan's opinion, "based on insufficient data[,] would not assist the trier of fact, the court in this instance, in arriving at the truth because the testimony is unreliable," and therefore, objects to the admission of Dr. Sullivan's expert testimony.

At the conclusion of the hearing, Defendant's counsel argued that based upon the testimony of Dr. Sullivan, Defendant has demonstrated by a preponderance of the evidence that Dr. Sullivan has the expertise to render an opinion, and there was sufficient data and information, specifically Dr. Sullivan's more than once review of the body cam videos, for him to come to the opinion that Defendant suffered a concussion before he was given his *Miranda* rights.

15

The Court concludes that because Dr. Sullivan did not express his opinions to a reasonable degree of medical or psychological certainty or probability, it cannot rely upon his opinions.  *See Finn v. Warren Cnty. Ky.,* 768 F.3d 441, 452 (6th Cir.2014); and *United States v. Noble*, No. 1:14-cr-135, 2017 WL 626130, at *7 (N.D. Ohio, 2/15/2017) (citing *Finn* and "noting that 'a reasonable degree of medical certainty' is the correct standard for expert witness testimony.")

The Court also concludes that even if Dr. Sullivan had expressed his opinions to a reasonable degree of medical or psychological certainty or probability, it would find that his testimony is not based on sufficient facts or data as required pursuant to Federal Rule of Evidence 702((b), and therefore, it is not reliable and would not help the trier of fact, in this case, the Court.

While the instant matter does not involve a proffer of "scientific testimony" as was the case in *Daubert*, it does involve proffered testimony from Dr. Sullivan, an expert in the field of clinical neuropsychology, and therefore, the guiding principles of *Daubert* apply to require that the Court act as the "gatekeeper" and determine whether the testimony of Dr. Sullivan is reliable.  In assessing the reliability of Dr. Sullivan's testimony, the Court notes that although use of the Glasgow Coma Scale has been peer-reviewed, no evidence was presented that a medical or psychological provider has determined a Glasgow Coma Scale score solely by reviewing body cam videos has been peer-reviewed.  Also, there was no evidence offered that use or application of the Glasgow Coma Scale alone, via review of body cam video only, is a methodology employed by other medical or neuropsychology professionals to determine if an individual sustained a concussion.  Dr. Sullivan himself could not cite to or describe generally a time that he had testified in court regarding his determination of the Glasgow Coma score to diagnose a concussion based solely upon his review of body cam video.

16

Moreover, the Glasgow Coma Scale is one tool or test that is utilized in the more comprehensive SCAT5 and SAT.  Dr. Sullivan conceded that the Glasgow Coma Scale is a test historically administered in person by a medical professional, or via personal interaction.  Indeed, the Court considers as "anecdotal" or "improper extrapolation" Dr. Sullivan's testimony concerning the "many times" body camera videos are used to administer the Glasgow Coma Scale.  Dr. Sullivan's reliance on this anecdotal evidence or improper extrapolation is a "red flag" that weighs against allowing his testimony.

Dr. Sullivan acknowledged that because he was not able to personally interact with Defendant, he was not able to evaluate his balance, his reflexes, and his ocular motor function, which assesses convergence, i.e., whether as an object comes closer to a person's face, the person's eyes continue to focus on that; what Dr. Sullivan described as a big area of assessment in the past few years.  Dr. Sullivan testified that the body camera videos did not allow him to evaluate these things, and that no one on scene did so.  These tests or assessments, among other things, are evaluated in the SCAT5, which he utilizes in his work for the Bengals.  He would have performed these tests if he had been on the scene with Defendant.  Dr. Sullivan testified that for purposes of evaluating whether Defendant had a concussion, it would have been helpful to interview Defendant on the day of the accident and assess him in person or observe Defendant and his interactions with the police and EMTs.  The Court concludes that this lack of testing by Dr. Sullivan, specifically interacting with Defendant face to face on scene, and assessing his balance, reflexes and motor ocular functioning is a "red flag" that weighs against allowing his testimony.

Although Dr. Sullivan did consider that Defendant might have been lying, faking, or malingering, he determined that Defendant was not lying, explaining that his experience with the

17

Bengals has shown that when a player is asked if he is o.k., the player may say he is fine, but then cannot remember who the team is playing that day.  So, according to Dr. Sullivan, an individual can lie and still have a concussion  However, the Court would submit that a football player stating that he is fine after a hit, whether because he actually thinks he is fine, or because he wants to continue to play, is different than an individual acting like he does not know what is happening after two firearms are found and he is facing potential criminal charges associated therewith.  Also, according to Dr. Sullivan, prior to the football season, all the players with the Bengals are evaluated with the SCAT5 so their baseline scores are known, and the professionals and coaches can look for any alterations in their baseline level of functioning.  Dr, Sullivan did not have, and would not have had, any baseline level of functioning for Defendant.  That fact, combined with the absence of any personal interaction and completion of other tests such as evaluating Defendant's balance, reflexes, and ocular motor functioning, leads this Court to conclude that Dr. Sullivan's basis for concluding that Defendant was not lying was not persuasive, but subjective.  Moreover, there is no dispute that Dr. Sullivan's testimony was prepared solely for this litigation.

Finally, Dr. Sullivan relied in part upon statements made by, or conversations had among police officers at the scene to support his opinion that Defendant had sustained a concussion in the accident, construing or interpreting these statements and/or conversations to mean that these officers believed the Defendant was impaired or had sustained a concussion.  What these officers believed is pure speculation on Dr. Sullivan's part, and at this point, their statements are hearsay.

Accordingly, the Court GRANTS the Government's Motion.  Although the Court concludes that Dr. Sullivan is an expert because he has specialized knowledge in clinical neuropsychology, the Court further concludes that he may not testify at the hearing on Defendant's Motion because, for the

reasons set forth above, his testimony is not based upon sufficient facts or data so as to make it reliable.

**IT IS SO ORDERED.**

           *s/Pamela A. Barker*
           PAMELA A. BARKER
Date:  April 19, 2023           U. S. DISTRICT JUDGE