IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:21-CR-785 |
| Plaintiff, | |
| -vs- | |
| | JUDGE PAMELA A. BARKER |
| RICHARD BURNLEY, | |
| Defendant. | MEMORANDUM OPINION & ORDER |

### Introduction

This matter is before the Court upon Defendant Richard Burnley's ("Defendant") Motion to Suppress (Evidentiary Hearing Requested) filed on January 3, 2023 ("Defendant's Motion"). (Doc. No. 19.) On January 10, 2023, the United States of America filed a Response In Opposition To Defendant's Motion ("the Government's Response"). (Doc. No. 20.) On January 17, 2023, Defendant filed a Brief In Reply ("Defendant's Reply"). (Doc. No. 22.) In Defendant's Motion, Defendant asserts that: 1.) Defendant's statements to law enforcement should be suppressed because he did not knowingly, voluntarily and intelligently waive his *Miranda* rights; and 2.) Defendant's Fourth Amendment right against unreasonable searches was violated when police conducted a warrantless search of his vehicle. (Doc. No. 19, PageID #s 53-56.)

By a non-document Order issued on January 13, 2023, and pursuant to an agreed-upon date by counsel for the parties, the Court set the hearing on Defendant's Motion for March 13, 2023. On January 30, 2023, Defendant filed a Notice of Expert Testimony Under Federal Rule of Evidence 702, notifying the Court and counsel for the Government of his intent to offer expert testimony from Thomas Sullivan, PH.D., ABPP, a Board-Certified Clinical Neuropsychologist ("Defendant's

Notice"). (Doc. No. 23.) Attached to Defendant's Notice were Dr. Sullivan's CV that includes a list of his publications, and a list of cases in which Dr. Sullivan has testified as an expert within the last four years. (Doc. Nos. 23-1 and 23-2.) On March 7, 2023, Defendant filed a letter authored by Dr. Sullivan wherein Dr. Sullivan stated that he had "observed [Defendant's] behavior on [police body cam videos] and will offer testimony that [Defendant] suffered a mild traumatic brain injury or concussion as a result of the motor vehicle accident." (Doc. No. 27, PageID # 106.)

On February 27, 2023, the Government filed a Motion for Daubert Hearing and Objection to Defense Expert ("the Government's Motion"), which Defendant opposed, but the Court granted on March 3, 2023. (Doc. Nos. 25, 26, and non-doc. order dated 3/3/2023.) The Daubert Hearing was conducted on March 13, 2023. On April 19, 2023, the Court issued a Memorandum Opinion and Order concluding that Dr. Sullivan could not testify at the hearing on Defendant's Motion because his testimony was not based upon sufficient facts or data so as to make it reliable. (Doc. No. 29.) The Court then set a hearing on Defendant's Motion to Suppress for May 15, 2023, but upon motion by Defendant, the hearing was reset to take place, and did take place on June 20, 2023. Post-hearing briefs were filed by Defendant and the Government, respectively, on July 6, 2023 and July 7, 2023. Accordingly, Defendant's Motion is now ripe for a decision.

**Background**[1]

On August 6, 2021, Defendant Burnley was an occupant of a vehicle involved in a head-on collision with a City of Cleveland police cruiser, occupied by patrol officers Sedlak ("Sedlak") and

---

[1] The facts set forth in this section are those adduced at both the March 13, 2023 hearing, and Government's Exhibits 2 and 4 and Defendant's Exhibits G1, G2, and G3 admitted at that hearing; and the June 20, 2023 hearing, and Government's Exhibits 1, 2, 3 and 4 (originally introduced as Exhibit 5), and Defendant's Exhibits A, B, D and E, admitted at that hearing.

2

Blackwell ("Blackwell"), at East 75th Street, south of Union Avenue, in Cleveland, Ohio ("the accident"). The driver's side airbag and the passenger's side airbag deployed in both the police cruiser and the vehicle Defendant was occupying. Both vehicles sustained heavy damage. Upon impact, Sedlak's head struck the windshield, and he was injured but exited the cruiser and helped Blackwell do so. As they approached Defendant who was standing a few feet away from the rear passenger side of the car involved in the accident, Sedlak and Blackwell ordered Defendant to get on the ground and show them his hands multiple times. Sedlak, who was shaken up by the accident, used profanity while yelling at Defendant, which was not typical for him to do, but he explained that his life had just flashed before him. Moreover, Sedlak maintained or believed that the vehicle Defendant was standing next to had been involved in drag racing with another vehicle, thereby causing the accident. Sedlak told Defendant not to run and Defendant did not run. Sedlak did not see anyone else in or around the car involved in the accident, did not see Defendant in the vehicle at any time, and did not see Defendant exit the vehicle. Anger is evident in both Sedlak's and Blackwell's voices as they approached Defendant and shouted at him to get on the ground and show his hands. Ultimately, Defendant complied with these officers' repeated orders, and Defendant was handcuffed by Officer Zagaria ("Zagaria") who, along with Officer Steinmetz ("Steinmetz"), had been the first officers to arrive at the accident scene to assist Sedlak and Blackwell.

Sedlak and other officers on scene accused Defendant of drag racing. When Defendant was asked if he was driving, Defendant can be heard stating, "I'm the passenger man," and "You all seen that guy get out of the driver's seat, right?" When asked again if he was driving, Defendant said "no" and told the officers that it was his cousin who was driving, and he ran.

In response to a question as to whether he was drag racing, Defendant said "no". In response to Sedlak telling Defendant how serious the accident was and asking if "you guys think f***ing flying up this f***king hill is a good idea drag racing?" Defendant's response was interrupted by Sedlak, but Defendant can then be heard stating that he "completely understand[s]." The police were given a description of the driver as wearing a black Nike hoodie and blue jeans, and Steinmetz spent time looking for this person, but he did not locate anyone. Sedlak testified that he felt that when he was asking questions of Defendant that he was getting answers that made sense and that Defendant understood what Sedlak was saying to him. As of the conclusion of Sedlak's interactions with Defendant, Sedlak had not determined who had been driving the vehicle.

Shortly after the above-described exchange, another officer, Bloxton, asked Defendant who was driving the car and Defendant responded that he could not tell him the driver's name, but it would not matter anyway because they would not find him. Defendant stated that he assumed the driver owned the car because he had seen him in it, that the driver lived off St. Clair, and that he was getting a ride to visit his friend.

After this discussion, Zagaria walked around the vehicle involved in the accident, and saw in plain view two firearms, a Glock 17 9mm and a Desert Eagle. Then, Defendant was asked if the driver had anything else in the car, and approximately 10 seconds later responded, "I don't even know what the f*** really just happened." Defendant then also stated that he did not know he had been in an accident, that it involved a police officer or that the car had been damaged, and "how did I crash?". Officers other than Steinmetz then engaged in an exchange among themselves concerning Defendant, stating: "do you think he has a concussion or is just playing dumb"; "it might be both, man, honestly"; and then "he was fine until I was asking a little more questions."

4

Subsequently, and specifically after Defendant had been handcuffed, after Defendant had been asked multiple times if he, or who, was driving the car or who he was riding with, after Defendant had been accused of or asked about drag racing, after Defendant had been asked if the driver had anything else in the car, after Defendant had expressed that he did not know what had happened, that he had been in an accident involving a police officer, or that the car had been damaged, and after officers had questioned and commented upon whether Defendant had a concussion or was playing dumb, Steinmetz, who was present and heard these statements of Defendant and the officers, read Defendant his *Miranda* rights. When asked by Steinmetz if he understood his rights, Defendant responded affirmatively.

After his *Miranda* warnings, Defendant was then asked if he thought he was impaired, if he knew where he was, if he knew what day it was, and he was also questioned about the two guns located in the vehicle, but he denied any knowledge of them. Defendant continued to state or mutter that he did not know what had just happened. However, Defendant was able to provide his name, spell his last name, and provide his date of birth.

Steinmetz believed that Defendant was able to understand and did understand the *Miranda* warnings or advisement he gave Defendant for several reasons. First, Defendant replied "yeah" when asked if he understood his rights. Second, Defendant asked what he had crashed into, meaning to Steinmetz that Defendant was "cognitive of what had just happened." Third, according to Steinmetz, Defendant seemed normal while speaking with every officer with whom he had heard him interact, and he was able to answer questions. Fourth, Steinmetz heard the emergency medical services ("EMT") individual ask Defendant where he was hurting, to which Defendant ultimately responded that his right knee was hurting, and if he was driving the car, to which Defendant responded, "I think

so, it's my car," and heard the EMT say that Defendant was not going to be taken to trauma and was stable.

Fifth, while escorting Defendant to his police cruiser, Steinmetz heard Defendant: yell out phone numbers to someone in the street; answer "yes" to a question whether there was anything in his pockets that would injure the officers; discuss the guns or what he clarified was a gun that he bought on the streets, but from whom he was not going to say; ask if he would be able to make a phone call from jail; and was apologetic.

Steinmetz has been a police officer for 23 years and during that time has interacted with a number of suspects and has talked to suspects and engaged with them about what might have occurred in any given instance. He has never undergone training for determining if someone has a concussion. However, in his experience interacting with suspects, he has had a suspect go from knowing what is going on to then acting like they do not know what is going on. So, sixth and finally, when Steinmetz heard Defendant make statements as though he did not know what was happening, Steinmetz believed that Defendant was possibly trying to cover up or hide the truth.

On August 17, 2022, ATF Special Agent Cory Miles ("SA Miles") interviewed Defendant while he was being detained at the Cuyahoga County jail on state charges, because he had learned that the Glock 17 9mm recovered from the vehicle involved in the accident had been purchased by an acquaintance of Defendant's mother. SA Miles had an ongoing investigation regarding possible straw purchasing occurring at local gun stores, and during that investigation, he had interviewed Defendant's mother sometime during 2020. Before questioning Defendant, SA Miles verbally advised Defendant of his *Miranda* rights or warnings and provided him with an Advice Rights Waiver *Miranda* Form that Defendant signed. After advising Defendant of his *Miranda* rights, Defendant

6

admitted that he was the driver of the vehicle involved in the accident and that he possessed the firearms recovered from it.

Defendant argues that the evidence demonstrates that his waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), was not a knowing, voluntary, and intelligent waiver because of the injuries he sustained during the accident, i.e., a concussion, and that because law enforcement officers were aware of his condition or had suspicions concerning Defendant's well-being, but questioned him anyway, the Court should suppress the statements he made in response to these improper police inquiries. Defendant also argues that any statements subsequently made to ATF officers at the August 17, 2023 interview of Defendant should be suppressed as "fruits of the poisonous tree" even if they mirandized Defendant during it. Defendant contends that but for the initial statements he made at the scene of the accident, he would not have felt compelled to attend the interview and provide information that he hoped would assist him with his case. Finally, Defendant argues that there was no probable cause to search Defendant's vehicle, requiring this Court to suppress the firearms found in it. (*Id.*) According to Defendant, since the exchange between Zagaria and Steinmetz about the guns located in Defendant's car occurred within five minutes of the accident, as demonstrated by body camera video, the assertion that the weapon was in plain view is suspect, and not credible.

In response, the Government argues that in viewing the totality of the circumstances of law enforcement's encounter with Defendant at the scene of the accident, from their perspective, law enforcement had no reason to believe Defendant could not understand his *Miranda* warnings. Also, the Government argues that under the plain-view doctrine, and because police were in a lawful position to view the guns in Defendant's vehicle because they were investigating a serious motor vehicle crash involving a police vehicle, and the firearms were seen on the driver's floor, police could

7

seize them without a warrant.  And, according to the Government, the weapons would have been discovered during an inventory search because Defendant's vehicle was disabled from the crash and had to be towed from the scene.  Moreover, the Government asserts that even if the statements made by defendant at the scene of the accident violated his *Miranda* rights, the statement made to SA Miles is still admissible.

### Law and Analysis

The Government bears the burden of proving the defendant "voluntarily, knowingly, and intelligently waived his rights to silence and counsel." *United States v. Bentley*, 726 F.2d 1124, 1128 (6th Cir. 1984).  "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). "This means the government must establish that it was more likely than not that a defendant was read his *Miranda* rights and acknowledged that he had a right to remain silent." *United States v. Spaulding*, 446 F. Supp. 2d 789, 800 (N.D. Ohio 2006).

"[C]ourts look to the totality of the circumstances to determine whether a confession is voluntary."  *Withrow v. Williams*, 507 U.S. 680, 693 (1993).  In *Withrow*, the Court found that relevant circumstances include:  (1) police coercion; (2) duration of the interrogation; (3) location of the interrogation; (4) the defendant's maturity; (5) the defendant's education background; (6) the defendant's physical condition and mental health; and (7) whether the defendant was informed of his or her *Miranda* rights.  *Id.*

According to the Sixth Circuit, "the *Miranda* waiver inquiry ha[s] two dimensions: voluntariness and comprehension" and these two dimensions must be examined from the perspective

of the police. *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009), citing *Moran v. Burbine*, 475 U.S. 412, 421 (1996). When considering a *Miranda* waiver, "[t]he relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *Id.*, 557 F.3d at 263, quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987). The Sixth Circuit has established three requirements for a finding that a confession was involuntary due to police coercion: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416 422 (6th Cir. 1999).

And the Court may rely on the evidence in the record of a defendant's conduct leading up to the interrogation to determine the defendant's capacity to waive his *Miranda* rights voluntarily, knowingly, and intelligently. *Garner*, 557 F.3d at 261-62, citing *United States v. Turner*, 157 F.3d. 552, 555 (8th Cir. 1998) (holding that defendant with low IQ knowingly waived his rights and noting that, at the time that defendant was stopped by police, defendant acted "in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing"); and *United States v. Solano-Godines*, No. 96-10255, 1997 WL 407861, at *3 (9th Cir. July 21, 1997) (holding that waiver was knowing and intelligent where defendant "understood everything else that was going on throughout the day" and made up a "clever story that he was framed").

Where individuals are not advised of their rights, "*Miranda* dictates that answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief."

*Oregon v. Elstad*, 470 U.S. 298, 317 (1985). "'The exclusion of unwarned statements…is a complete and sufficient remedy' for any perceived *Miranda* violation.'" *United States v. Patane*, 542 U.S. 630, 641-42 (2004), quoting *Chavez v. Martinez* 123 S. Ct. 1994. However, the automatic exclusion does not extend to evidence obtained as a result of an unwarned statement, because the failure to deliver *Miranda* warnings is not itself a constitutional violation, and the *Miranda* presumption "does not require that the statements and their fruits be discarded and inherently tainted." *Oregon*, 470 U.S. at 309. Instead, so long as the unwarned statement was voluntary under the Fifth Amendment, the other evidence is admissible. *Id.* at 309.

The evidence adduced at the hearings demonstrates that from the time that officers first approached Defendant as he stood a few feet away from his vehicle through to and including Steinmetz giving Defendant the *Miranda* warnings, and Steinmetz and Zagaria escorting Defendant to their cruiser for transport, the police officers at the scene had no indication, or no reason to believe that Defendant's age, experience, education, background, and intelligence or any mental health issues may have prevented him from understanding the *Miranda* warnings when they were ultimately given to him by Steinmetz. The evidence adduced at the hearings to include footage of body camera videos demonstrates that the duration of the interrogation, either before or after Defendant was given the *Miranda* warnings, was not unduly long; Steinmetz gave Defendant the *Miranda* warnings before Defendant admitted he thought he was the driver and he had bought a gun from someone on the streets; and when Steinmetz asked Defendant if he understood the warnings, Defendant responded "[y]eah". Indeed, Defendant does not assert or argue otherwise.

Defendant does not assert or argue that there was "police coercion", much less deliberate police coercion. Defendant does assert, however, that there was "general disorder that occurred after

the accident" or at the location of the interrogation *before* Defendant was given his *Miranda* warnings by Steinmetz. Defendant is correct in asserting that multiple squad cars arrived at the accident scene, and before, but primarily after, Defendant was handcuffed thereby removing safety concerns, different officers shouted at and/or questioned Defendant about who was driving the car, whether he was drag racing, and how the accident had occurred, and none of these officers ever advised Defendant that he was not under arrest. Indeed, while these facts may demonstrate that as of the time Defendant was handcuffed, he was in custody and therefore should have been provided his *Miranda* warnings at that point in time, necessitating the suppression of his statements made *before* he was given those warnings,[2] these facts do not amount to a level of deliberate police coercion that would render his post-*Miranda* warnings statements involuntary. *See United States v. Hemphill*, 2010 WL 3366137 (S.D. Ohio Aug. 20, 2010), citing *United States v. Sylvester*, 330 F. Appx. 545 (6th Cir. 2009).

Sedlak and Blackwell angrily, loudly, and repeatedly shouting orders to get on the ground and show his hands to Defendant, the sole person seen standing a few feet away from the other vehicle involved in a head-on collision that Sedlak believed was caused by the driver of that vehicle drag racing over a hill, does not constitute police coercion, particularly because Defendant did not immediately comply with those police orders. Neither does the profanity and accusatory tone of Sedlak, standing alone, since the other uninjured officers who came upon the accident scene to assist

---

[2] *See United States v. Hemphill*, 2010 WL 3366137 at *3-6 (S.D. Ohio Aug. 20, 2010), where the Court, in applying the totality of the circumstances approach by the Sixth Circuit and a number of other factors outlined by it, determined that the defendant was in custody during the interrogation by his parole officer, because the defendant was in handcuffs, he had not been advised that he was not under arrest, and when the parole officer questioned him he was surrounded but not questioned by several police officers, some of which were wearing ski masks; this, despite the fact that the interrogation did not last for a long period of time and it took place in neutral locations.

and questioned Defendant did not use profanity or shout, and asked open ended questions. The evidence does not demonstrate that the on-scene behavior of police officers was so coercive as to overbear Defendant's will when he responded affirmatively to Steinmetz when asked if he understood his *Miranda* warnings and when he later admitted to driving and buying one of the guns. Also, the evidence does not demonstrate that the shouting and profanity used by Sedlak and Blackwell to ensure compliance by Defendant with their orders, and Defendant being handcuffed, were the crucial motivating factors in Defendant's decision to ultimately admit that he thought he was the driver because it was his car, and that he bought one of the guns on the streets, *after* he was given his *Miranda* warnings.

The primary argument by Defendant is that officers' conversations heard on the body camera footage and overheard by Steinmetz, speculating about whether Defendant had sustained a concussion, demonstrate that the officers knew that Defendant could not understand his *Miranda* warnings and therefore, could not knowingly and voluntarily waive his *Miranda* rights. While one officer did ask another whether he thought Defendant had a concussion or was just playing dumb, the other officer responded that it might be both, explaining that Defendant was fine until he had started asking more questions. So, while these officers may have speculated that Defendant had sustained a concussion, they also speculated that Defendant was playing dumb. Also, while Steinmetz, who unlike Sedlak had not been involved and injured in the accident, was not trained to recognize or diagnose a concussion, with his twenty-three years of experience dealing with suspects, and his first-hand interaction with Defendant and knowledge of statements made by Defendant and others at the scene, to include the EMS representative indicating that Defendant was stable, Steinmetz reasonably believed that Defendant understood his *Miranda* rights and voluntarily waived them.

Indeed, after Zagaria saw the firearms in the vehicle, an officer inquired of Defendant as to whether the driver had anything else in the car, and it was then while a search of the car was underway and after a substantial pause in responding to Zagaria, that Defendant appeared to become befuddled by repeatedly asking what just happened. When Defendant was asked questions before the guns were found in the car, he was able to respond and was calculating in asserting that he was not the driver and that the driver had run off and he even described the clothing that the driver was wearing. Defendant was so persuasive in his statements that Steinmetz went looking for the driver. Comparing Defendant's responses to questions posed to him before the firearms were found in the car, his responses to questions posed to him by the EMS representative, and his admissions to Steinmetz while being escorted to the police cruiser, with the repeated statements about not knowing where he was at or what had just happened, this Court finds that the statements Defendant argues demonstrates his befuddlement were a ruse, and he understood his *Miranda* warnings and voluntarily and knowingly waived them at the accident scene.

Accordingly, any unwarned statements made by Defendant during the custodial interrogation of him at the scene of the accident before his *Miranda* warnings were given to him were involuntary and must be suppressed. However, warned statements made by Defendant after what this Court has determined to be a knowing and voluntary waiver of his *Miranda* rights at the accident scene, to include his admissions that he was the driver and he had bought one of the guns found in the car will not be suppressed. Neither will the statements made to Agent Miles 11 days later after Defendant was given his *Miranda* warnings again and waived them in writing. Indeed, even if there had been police activity that was objectively coercive sufficient to overbear Defendant's will and was the crucial motivating factor in Defendant's decision at the accident scene to admit to being the driver

13

and buying one of the guns, which the Court has concluded has not been demonstrated, Defendant's argument that his admissions to SA Miles that he was the driver and possessed the guns must be suppressed as fruits of the poison tree is rejected.

In support of Defendant's argument that law enforcement had no probable cause to search Defendant's vehicle, requiring this Court to suppress the firearms found in it, Defendant merely asserts or argues that Zagaria's testimony that he saw the firearms in the vehicle in plain view is suspect or not credible. However, the Court finds Zagaria's testimony credible, and not suspect when evaluated along with the body camera footage that Defendant invited the Court to consider. Since the firearms were in plain view in Defendant's vehicle while police officers were investigating an accident, they are not subject to suppression. *United States v. Campbell*, 549 F.3d 364 (6th Cir. 2008). And the Court agrees with the Government that the weapons would have been found pursuant to an inventory search, which is "a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013), quoting *Colorado v. Bertine*, 479 U.S. 367 (1987).

For the reasons set forth above, Defendant's Motion is GRANTED IN PART AND DENIED IN PART. Any statements made by Defendant before he was given his *Miranda* warnings by Steinmetz at the accident scene are suppressed. However, any statements made by Defendant after he was given his *Miranda* warnings at the scene of the accident and statements given to S.A. Miles are not suppressed. Finally, the firearms are not subject to suppression.

**IT IS SO ORDERED.**

Date:  September 1, 2023

　_s/Pamela A. Barker_　
PAMELA A. BARKER
U. S. DISTRICT JUDGE